IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 2, 2021

**IN RE AMORA S.**

**Appeal from the Juvenile Court for Hamblen County**
**No. J180009          Janice H. Snider, Judge**

_____

**No. E2021-00338-COA-R3-PT**

_____

This appeal involves the termination of a father's parental rights. The child was placed into the custody of the Tennessee Department of Children's Services ("DCS") in May 2019. DCS subsequently filed a petition to terminate the father's parental rights in the Hamblen County Juvenile Court ("Juvenile Court"). Following trial, the Juvenile Court entered an order terminating the father's parental rights to the child, upon its finding by clear and convincing evidence that the father had failed to manifest an ability and willingness to parent the child, that returning the child to the father's custody would pose a risk of substantial harm to the child's psychological welfare, and that termination of the father's parental rights was in the child's best interest. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Whitney P. Trujillo, Strawberry Plains, Tennessee, for the appellant, Ronald S.

Herbert H. Slatery, III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

In March 2020, DCS filed a petition to terminate the parental rights of Ronald S. ("Father") and Beatriz C. ("Mother") to the minor child, Amora S. ("the Child").[1]  In its petition, DCS alleged several grounds for the termination of Father's parental rights. However, all but one ground against Father had been voluntarily dismissed by DCS when the trial began.

The Juvenile Court conducted a trial in January 2021.  Tennessee Code Annotated § 36-1-113(g)(14) was the sole ground for termination of Father's parental rights before the Juvenile Court during trial, which required DCS to prove either that Father had failed to manifest an ability or a willingness to assume custody of or provide financial support for the Child, as well as prove that placing the Child with Father would pose a risk of substantial harm to the physical or psychological welfare of the Child.

Father did not appear at trial, but his attorney was present to represent him during the proceedings.  At the beginning of trial, the record reflects that several exhibits were "premarked" as exhibits one through seventeen.  These exhibits consisted of the Child's birth certificate, the Juvenile Court file from the dependency and neglect action, and publication documentation concerning Mother.  The Juvenile Court admitted as late-filed exhibit eighteen, the return of the summons for Father in the termination of parental rights proceeding.  The eighteenth exhibit was the only exhibit that DCS moved the Juvenile Court to admit into evidence at trial.

Brianna Hanson, a family support worker with DCS, testified at trial.  The Child had been in DCS custody since May 2019, shortly after her birth.  Ms. Hanson had been the Child's case manager since November 2020, which was approximately two months at the time of trial.  However, the previous case manager was not present for trial and was reportedly no longer employed by DCS.  At the beginning of trial, Father objected to Ms. Hanson's testimony regarding anything occurring before November 2020 due to lack of personal knowledge.  As relevant to this objection, Father's counsel stated that no "TFACTS Recordings" had been included on the "Exhibit List" she had been provided. The Juvenile Court took the matter under advisement and instructed Father to raise the issue again as testimony arose that he believed to be inadmissible.

---

[1] Although the termination of parental rights proceeding involved Mother, she has not appealed the termination of her parental rights or participated in this appeal.  Therefore, we will address only the facts and issues as relevant to Father.

Ms. Hanson testified that neither she nor the Child had any contact with Father since she had been assigned to the case. Ms. Hanson further testified that she had attempted to contact Father at his last known telephone number and had assisted the previous case manager with mailing a letter to Father's last known address in November 2020. The letter informed Father that she was the new case manager, notified him of the date of the termination of parental rights proceeding, and included a copy of the criteria for termination of parental rights. This letter was not returned to her. During cross examination, Father's attorney referred to one of the first seventeen exhibits when discussing Father's address.

During her testimony, Ms. Hanson stated that she had never received a telephone call, text message, or visitation request from Father. According to Ms. Hanson, she tried to contact Father every week, attempted to find him on Facebook, and tried to contact the parents' family members. She testified that Father had not provided DCS with reports regarding his completion of required assessments or other requested documents. DCS had two telephone numbers for the parents, but the parents never indicated which number belonged to whom. Ms. Hanson stated that she sent text messages to both numbers but was unable to leave voicemail messages at those numbers. No one answered the phone calls or sent text messages back to her. Additionally, Ms. Hanson testified that she attempted a home visit at two different addresses, but no one answered the door.

The Child's foster mother, V.W. ("Foster Mother"), also testified at trial. Foster Mother had the Child in her home since she picked her up from the hospital in May 2019. Foster Mother lived in the home with her significant other, R.C. ("Foster Father"), their five-year-old adopted child, and the Child.[2] Foster Mother and Foster Father had been together for over twenty years and had adopted a child together. Foster Mother testified that the Child had been sleeping in Foster Mother and Foster Father's room but that she would have her own room or share with "her sister," the foster parents' adopted child. Foster Mother testified that the Child referred to her and Foster Father as "Mommy" and "Daddy," respectively. According to Foster Mother, she and Foster Father desired to adopt the Child.

Foster Mother stated that the parents had visitation with the Child when the Child first was placed into DCS custody. When asked when the Child had last visited with her parents, Foster Mother testified that she was unsure of the exact date but believed the Child had not seen her parents since November 2019. Foster Mother testified that Father had never called the foster parents but that he had Foster Father's cell phone number to contact them. According to Foster Mother, the parents had not sent any gifts, letters, or cards for the Child other than providing the Child with a pack of diapers and some clothing prior to

---

[2] Foster Mother's significant other is referred to as her "husband" in several places in the record, but Foster Mother stated that they were not married.

November 2019. Furthermore, Foster Mother testified that the parents had not financially supported the Child other than the aforementioned items given to Foster Mother for the Child. Foster Mother explained that the clothing provided to the Child was mostly passed down from the parents' older daughter, but they had also given her a new matching outfit set for the Child.

At the conclusion of trial, the Juvenile Court granted DCS's petition to terminate Father's parental rights, upon its determination that Father had failed to manifest an ability and willingness to parent the Child and that placing the Child with Father would cause a substantial risk of harm to the Child's psychological welfare, pursuant to Tennessee Code Annotated § 36-1-113(g)(14). The Juvenile Court also found by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. In its judgment, the Juvenile Court found as follows in pertinent part:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The [Child] was removed into DCS custody on May 21, 2019, after she was born drug-exposed to [Mother]. Amora was born seven weeks premature after her mother suffered a placental abruption. [Mother] admitted to using cocaine two or three days before the child was born. [Father] lived with [Mother] at the time of the child's removal, but he was not a placement option. On August 21, 2019, the Hamblen County Juvenile Court found by clear and convincing evidence that the child was dependent and neglected and severely abused due to [Mother's] drug use while pregnant.

* * *

### GROUND VI
### FAILURE TO MANIFEST ABILITY TO PARENT
### T.C.A 36-1-113(g)(14)
### (Applies to [Mother] and [Father])

* * *

The parents visited the child a few times between the months of May and November 2019. Both parents had the foster parents' contact information but the parents ceased any form of contact with the foster parents or the child after November 31, 2019. All subsequent attempts by the DCS to contact the parents proved unsuccessful.

When she took over the case in November, 2020, DCS Case Manager Brianna Hanson attempted to locate the parents at their last known addresses.

She went to each parent's home, but no one appeared to be home. CM Hanson sent letters to the parents' last known addresses. These letters were not returned as "undeliverable," but Ms. Hanson never received a response from either parent. She texted the father on two different phone numbers he had previously provided to DCS, but received no response. Thereafter, CM Hanson made weekly efforts to locate or contact the parents, to no avail. CM Hanson was unsuccessful in ever locating either parent between November, 2020, and the date of this TPR trial.

The parents' lack of contact with Amora or DCS for over 14 months demonstrates a clear lack of willingness to parent . . . their child.

There is nothing in evidence in this case from which the Court could find that either parent possesses the ability to parent Amora. Neither parent chose to contact their appointed counsel or participate in this trial to offer any explanation for their absence in the child's life, offer evidence of their ability to parent, or express any desire to parent Amora. Both parents failed to financially support this child at any time since her removal into state custody. Nothing can be determined concerning the parents' current living situation. The child was removed at birth and has had no contact with her parents since 2019. She has no bond with or remembrance of either of her parents.

The Court finds by clear and convincing evidence that neither [Mother] nor [Father] have expressed any willingness or have demonstrated any ability to parent Amora. The Court further finds that returning Amora to her parents' home would clearly be detrimental and impose a substantial risk of harm to her psychological welfare.

The grounds for Tenn. Code Ann. § 36-1-113(g)(14) have been met, and Ground VI of the Petition is sustained as to [Mother] and [Father].

### BEST INTEREST
### Tenn. Code Ann. § 36-1-113(i)

* * *

(1) and (2) No evidence was presented indicating that either parent has made any adjustment in their circumstances or conditions that would make it safe for the child to return home to them.

(3) The parents have not maintained regular visitation, and their last known contact with the child was in November 2019.

(4) and (5) Amora has no meaningful relationship with her parents. She last saw them when she was merely six months old. She has continuously lived in her current foster home since she was removed into state's custody. In fact, her foster mother brought her home from the hospital. Her foster parents are the only parents Amora has ever known. It is obvious that a change of caregivers and physical environment would have a traumatic effect on this child emotionally.

(6) Due to the parents' unknown circumstances, this ground is not applicable to the Court's analysis.

(7) Due to the parents' unknown circumstances, this ground is not applicable to the Court's analysis.

(8) Due to the parents' unknown circumstances, this ground is not applicable to the Court's analysis.

(9) Although the Adjudicatory Order entered in this case does not specifically require the parents to pay support, parents have a duty by law to support their child. The parents provided a few items such as diapers and clothing early in the case, they have paid no child support.

The Court may also consider such other factors as it deems appropriate in these cases. It is important to note that Amora has been with loving foster parents since they brought her home from the hospital. The foster parents have an adequate home and sufficient income to support her. The foster parents also have a five-year old daughter that loves Amora. They wish to adopt this child and provide a permanent home for her.

For these reasons, the Court finds by clear and convincing evidence that, based upon the considerations set forth in Tenn. Code Ann. § 36-1-113(i), it is in the best interest of the child for the parental rights of [Mother] and [Father] to be terminated.

Father timely appealed to this Court.

**Discussion**

Although not stated exactly as such, Father raises the following issues for our review on appeal: (1) whether the exhibits were properly admitted into evidence during trial; (2) whether the Juvenile Court erred by improperly applying the missing witness rule due to Father's absence at trial; (3) whether the Juvenile Court erred by entering an improper de facto default judgment; (4) whether the Juvenile Court erred by applying an incorrect burden of proof; (5) whether the Juvenile Court erred by finding by clear and convincing evidence that Father had failed to manifest an ability and willingness to parent the child; and (6) whether the Juvenile Court erred by finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388.

_____

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence.  *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights.  *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings."  *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted).  The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof.  Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In combination with a best interest finding, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address Father's argument that the Juvenile Court erred by entering a de facto default judgment against Father. On appeal, Father argues that the summons in this case did not mention the period of time within which Father was required to answer the petition, that the rules of civil procedure require at least five days' notice of a default judgment, and that no notice was given to Father that a default judgment would occur on the day of trial. It is well settled that even in a parent's absence at trial, the petitioner must present evidence to support the ground for termination and to demonstrate that termination of the parent's rights is in the child's best interest. *See In re Connor B.*, 603 S.W.3d 773, 783 (Tenn. Ct. App. 2020); *State, Dep't of Children's Servs. v. D.L.M.L.*, No. E2005-02194-COA-R3-PT, 2006 WL 1072155, at *2 (Tenn. Ct. App. Apr. 24, 2006). In fact, even if a trial court grants a default judgment against a party in a termination of parental rights case, the petitioner still must present evidence to support the alleged statutory grounds and best interest analysis. *See* Tenn. Code Ann. § 36-1-117(n); *In re Connor B.*, 603 S.W.3d at 783; *In re B.G.J.*, 215 S.W.3d 396, 399 (Tenn. Ct. App. 2006).

In this case, however, we see no evidence that DCS requested a default judgment or that the Juvenile Court entered a default judgment against Father, pursuant to Tennessee Rule of Civil Procedure 55.01. Father failed to appear on the day of trial. Counsel for DCS, the DCS case manager, the foster mother, counsel for Father, and the guardian *ad litem* were all present for trial. The Juvenile Court proceeded to conduct an evidentiary trial in Father's absence with his attorney present to represent him. DCS presented evidence in support of the statutory ground for termination and whether termination of Father's parental rights was in the Child's best interest. The Juvenile Court subsequently entered an order making findings of fact and conclusions of law based on the evidence, in which it found by clear and convincing evidence that DCS had met its burden of demonstrating that a ground existed to terminate Father's parental rights and that termination of Father's parental rights was in the Child's best interest. Thus, we find and hold that the Juvenile Court did not enter a default judgment against Father and, therefore, did not err in this case by entering a de facto default judgment against Father.

We next address Father's issue concerning whether certain exhibits were properly admitted into evidence. The record reflects that exhibits one through seventeen were "premarked" at the beginning of the hearing. However, DCS's counsel never moved for those exhibits to be entered into evidence, and the record does not reflect an agreement by the parties to do so. In its appellate brief, DCS acknowledges its failure to admit the first seventeen exhibits into evidence. However, it argues that Father has waived his issue regarding the admission of those exhibits because he failed to object during trial. According to DCS, Father had "ample opportunities to object" and the parties had relied on the exhibits as if they were properly admitted. We disagree with DCS's argument that Father waived the issues regarding admission of exhibits one through seventeen.

Tennessee Rule of Evidence 103(a)(1) provides that a party may not assign error to a ruling admitting evidence unless a substantial right of the party is affected and "a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground was not apparent from the context." Although Father's counsel mentioned an "Exhibit List" and referred to at least one of the initial seventeen exhibits during trial, we disagree that this constituted a waiver of the issue when DCS never moved to admit the exhibits into evidence during trial. Because DCS counsel never moved to admit the exhibits into evidence, Father was not given an opportunity to object to their admission.

Based on the record before us, we agree with Father that DCS never properly admitted those exhibits into evidence during trial. A party wishing for an exhibit to be considered by the trial court must have the document admitted into evidence. *Brown v. Daly*, 884 S.W.2d 121, 125 (Tenn. Ct. App. 1994). In the absence of its admission into evidence, the court may not rely on the contents of the document in making its findings of

fact and conclusions of law. *Id.* In its order, the Juvenile Court included some findings of fact that appear to have, at least in part, relied upon those exhibits. However, we conclude that the Juvenile Court's reliance on the exhibits was not significant when addressing the ground for termination of Father's parental rights and the best interest analysis as other evidence properly admitted was more than clear and convincing as to both grounds and best interest. Therefore, we determine this error to be harmless.

We next address whether the Juvenile Court erred by applying an incorrect burden of proof. It is well settled that the burden of proof in a termination of parental rights action lies with the petitioner seeking to terminate a parent's rights. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007) ("Parties seeking to terminate parental rights . . . have the burden of proving that there exists a statutory ground for termination."). As such, the burden of establishing that statutory grounds existed to terminate Father's parental rights remained with DCS.

Father specifically takes issue with certain findings made by the Juvenile Court concerning the statutory ground for termination of Father's parental rights. In its judgment, the Juvenile Court noted that there was no evidence in the record to support a finding that Father possessed the ability to parent the Child. The Juvenile Court further found that Father had not chosen "to contact [his] appointed counsel or participate in this trial to offer any explanation for [his] absence in the child's life, offer evidence of [his] ability to parent, or express any desire to parent Amora."[6] Father argues that these statements by the Juvenile Court are tantamount to burden shifting to improperly place the burden of proof on Father. Upon our review of the judgment, we disagree with this characterization of the Juvenile Court's statements.

A similar argument was made by a parent in *In re Amelia M.*, No. E2012-02022-COA-R3-PT, 2013 WL 4715043, at *14 (Tenn. Ct. App. Aug. 30, 2013). A parent in *In re Amelia M.* argued that the trial court had improperly shifted the burden of proof to the parent to prove that a meaningful relationship existed between him and the child. *Id.* The trial court in *In re Amelia M.* stated in its best interest analysis that Father had not demonstrated to the court that an emotional attachment existed between him and the child. *Id.* However, this Court noted that the trial court already had summarized the causal relationship between Father's failure to visit the child and the lack of a meaningful relationship and had included other findings following the statement at issue that further emphasized the causal link resulting from Father's failure to visit. *Id.* As a result, this Court ultimately held that the trial court had not shifted the burden of proof to the parent when it required the petitioners to establish their burden of proof before ruling that the

---

[6] This statutory ground for termination concerned both Mother and Father; however, we only address this ground and the Juvenile Court's findings as related to Father.

parent was unable to refute the proof established by the petitioners. *Id.* We find this Court's holding in *In re Amelia M.* to be persuasive to the evidence and record of this case.

Prior to making its statement regarding Father's absence from trial and his failure to present evidence on his own behalf, the Juvenile Court already had made many findings of fact supporting the ground for termination. Regarding the statutory ground for termination, the Juvenile Court found that Father had visited the Child between May and November 2019 but that he had ceased all contact with the Child and the foster parents since that time. The Juvenile Court further found that Father had in his possession contact information for the foster parents but had not contacted them. The Juvenile Court also made findings of fact concerning the efforts the new case manager made to locate Father during the two months she had been assigned to the case. After making these findings, the Juvenile Court found that Father's "lack of contact with Amora or DCS for over 14 months demonstrates a clear lack of willingness to parent" the Child. Only then did the Juvenile Court address Father's absence from court and his decision not to present evidence on his own behalf to rebut DCS's proof. We hold that the Juvenile Court did not shift the burden of proof onto Father concerning the statutory ground for termination but instead found that Father had failed to rebut the proof presented by DCS.

Additionally, Father argues that the Juvenile Court improperly applied the missing witness rule in this case. The missing witness rule provides that "'the failure of a party to call a witness gives rise to a permissible inference that the missing witness' testimony would have been unfavorable to the party who failed to call the witness.'" *In re Estate of Price*, 273 S.W.3d 113, 140 (Tenn. Ct. App. 2008) (quoting *Gentry v. Gentry,* No. E2000-02714-COA-R3-CV, 2001 WL 839714, at *4 (Tenn. Ct. App. July 25, 2001) (citing *State v. Francis,* 669 S.W.2d 85, 88 (Tenn. 1984)) (internal footnote omitted)). The missing witness rule may apply to parties in civil trials, when the party has "knowledge of material facts, naturally favorable testimony, and availability to judicial process," and this rule is applicable in both jury trials and bench trials. *In re Mattie L.*, 618 S.W.3d 335, 342-43 (Tenn. 2021). "While a presumption tilts the scales of legal reasoning toward a particular result, a permissive inference merely enables the trier of fact to draw on logical leaps that are ordinary to our shared experience." *Id.* at 343. A petitioner cannot rely on this inference to avoid his or her burden of proving a prima facie case to support his or her claims. *Id.* Our Supreme Court recognized that the missing witness rule "carries no more legal force than the commonsense inference it permits the trier of fact to apply in weighing the evidence." *Id.* at 344.

In the present case, no party requested application of the missing witness rule. Father does not point to a statement by DCS regarding Father's failure to testify on his own behalf. Instead, Father takes issue with the Juvenile Court's finding that he had not appeared at trial to present evidence on his own behalf. As we already stated above, the Juvenile Court examined the evidence presented by DCS and made findings of fact

- 13 -

regarding the statutory ground for termination based on the evidence presented by DCS. We see nothing in the record that leads us to conclude that the Juvenile Court had applied a permissible inference that Father's testimony would have been unfavorable to him. The Juvenile Court simply recognized that Father had not appeared in court to submit evidence in order to rebut the evidence presented by DCS. Therefore, we find no merit to Father's argument in this regard.

We next address Father's issue concerning the statutory ground found by the Juvenile Court. The sole ground for termination of Father's parental rights was based on Tennessee Code Annotated § 36-1-113(g)(14) (2021), which provides as follows:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

This ground has two prongs. Regarding the first prong of our analysis, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). The second prong of the statute requires the court to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *See* Tenn. Code Ann. § 36-1-113(g)(14) (2021).

With regard to the first prong of this ground, the Juvenile Court found that Father had not expressed a willingness or demonstrated an ability to parent the Child. A parent's actions or inaction can be analyzed by the trial court in its determination of whether the parent has established a lack of willingness to assume custody of or financial responsibility for the Child. *See In re Ryan J. H.*, No. M2019-01439-COA-R3-PT, 2020 WL 7861376, at *14 (Tenn. Ct. App. Dec. 22, 2020) ("Father's actions in the present case raise doubts as to his actual willingness to assume custody of the Child."); *In re Ellie K.*, No. M2019-01269-COA-R3-PT, 2020 WL 1943522, at *11 (Tenn. Ct. App. Apr. 23, 2020) ("It is well established that a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the child."). We agree with the Juvenile Court that clear and convincing evidence was presented by DCS to establish that Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for the Child, as required by Tennessee Code Annotated § 36-1-113(g)(14).

According to the Juvenile Court, Father's failure to visit the Child for over fourteen months demonstrated "a clear lack of willingness to parent" the Child. The Child had been

- 14 -

living with the foster parents since shortly after her birth. The Juvenile Court found that due to Father's lack of contact with the Child, the Child had no bond with or remembrance of Father. Despite having contact information for the foster parents, Father had not attempted to contact them to request visitation with the Child or otherwise tried to maintain a relationship with the Child. Additionally, although Father had provided some clothing and diapers for the Child early in her life, Father had not paid child support at any time since the Child was placed into foster care and had not provided any items for the Child in over a year.

Father did not rebut any of this evidence presented by DCS concerning Father's lack of willingness to assume custody of or financial responsibility for the Child. As the Juvenile Court noted, little is known regarding Father's current circumstances or living conditions at the time of trial due to his lack of contact with DCS or the Child. However, DCS must only prove either a lack of willingness or ability to assume custody of or financial responsibility for the Child. *See In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Therefore, although the Juvenile Court also found that Father did not have an ability to parent the Child, it is not necessary for us to address the Juvenile Court's finding regarding Father's ability because the evidence presented regarding Father's lack of willingness is clear. Based on the foregoing, we agree with the Juvenile Court's finding that DCS had presented clear and convincing evidence to support the first prong of Tennessee Code Annotated § 36-1-113(g)(14).

By the same quantum of proof, DCS has proven the second prong in establishing that returning the Child to Father's custody would pose a risk of substantial harm to the Child's physical or psychological welfare. Due to Father's absence from the Child's life for fourteen months and her young age, the Juvenile Court found that the Child had no remembrance of Father. Father is essentially a stranger to the Child. Conversely, the Child has been placed with the foster parents since she came home from the hospital following her birth. This Court has held that forcing a child to begin visitation with or giving custody to a parent who is a virtual stranger to the child would create a risk of substantial harm to the Child, sufficient to establish the second prong of Tennessee Code Annotated § 36-1-113(g)(14). *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020), *perm. app. denied* (Tenn. Dec. 10, 2020); *In re Bentley Q.*, No. E2019-00957-COA-R3-PT, 2020 WL 1181804, at *12 (Tenn. Ct. App. Mar. 11, 2020) ("Father's lack of presence in the Child's life posed a sufficient probable risk of substantial harm to the Child's psychological welfare if Father were to suddenly obtain custody of the Child."). We agree with the Juvenile Court that returning the Child to Father's legal or physical custody would create a risk of substantial harm to the Child. Therefore, we affirm the Juvenile Court's finding that DCS has proven this statutory ground for termination of Father's parental rights by clear and convincing evidence.

Having determined that a ground exists for the termination of Father's parental rights, we next address the best interest analysis. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)    In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)    Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)    Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)    Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian

from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2017).

With regard to making a determination concerning a child's best interest, our Supreme Court recently instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives

- 17 -

individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its analysis, the Juvenile Court considered each of the enumerated factors in Tennessee Code Annotated § 36-1-113(i). Regarding factors (1) and (2), the Juvenile Court found that there was no evidence presented to indicate that Father had made an adjustment to his circumstances to make it safe and in the Child's best interest to return to his home. In his brief, Father takes issue with the Juvenile Court's reliance on factor (2), arguing that DCS had not presented evidence of its efforts to assist Father prior to November 2020 and that no evidence was presented to support "an affirmative finding" of this factor. Noting the lack of evidence presented, the Juvenile Court did not find in its judgment that the factor weighed either in favor of or against the termination of Father's parental rights. After analyzing all the factors, the Juvenile Court found that clear and convincing evidence existed to terminate Father's parental rights. Looking at the Juvenile Court's order, it does not appear that the Juvenile Court erred by improperly relying on factor (2) to terminate Father's parental rights when the remaining factors considered by the Juvenile Court weighed heavily in favor of the termination of Father's parental rights. Even if the Juvenile Court had relied on factor (2) in its analysis, the remaining factors considered by the Juvenile Court would support a finding by clear and convincing evidence that the termination of Father's parental rights was in the Child's best interest.

Father also argues that DCS failed to present evidence to demonstrate that Father had not paid child support directly to DCS in order to support the Juvenile Court's finding that Father paid no support. However, there is evidence in the record to support the Juvenile Court's finding that Father had not paid child support for the Child. Foster Mother testified that Father had only provided a few items to her for the Child's benefit over fourteen months prior to trial. Foster Mother further testified that Father had provided no other financial support for the Child during the time she had the Child in her home, which was essentially the entire time the Child was in foster care. This testimony by Foster Mother supports the Juvenile Court's finding with regard to factor (9) that Father had not

paid any child support for the Child. We, therefore, find no error in the Juvenile Court's finding that Father had not paid child support for the Child.

Additionally, as relevant to factor (3), Father had absolutely no contact with the Child for fourteen months prior to trial. Despite having a telephone number for the foster parents, he had not contacted them or the Child since November 2019. The evidence is clear that Father had not maintained any kind of contact with the Child for over a year. Concerning factor (4), the Juvenile Court found that Father had not seen the Child since she was six months old and that the Child had no meaningful relationship with Father. Father was essentially a stranger to the Child by the time of trial. As to factor (5), the Juvenile Court recognized that the only parents the Child knows are the foster parents, who she has lived with since coming home from the hospital after her birth. As such, the Juvenile Court found that changing the Child's caregiver and physical environment at this point would have "a traumatic effect on this child emotionally." The Juvenile Court found that factors (6), (7), and (8) were not relevant to this case.

The Juvenile Court also considered as additional relevant factors in its best interest analysis that the foster parents wish to adopt the Child, have an adopted daughter who loves the Child, and have an adequate home and income to care for the Child. Upon its consideration of all best interest factors it deemed relevant, the Trial Court concluded that it was in the best interest of the Child for Father's parental rights to be terminated. The evidence presented during trial does not preponderate against the Juvenile Court's findings regarding best interest, and those findings are clear and convincing evidence that termination of Father's parental rights is in the Child's best interest. Therefore, we affirm the Juvenile Court's finding concerning the best interest analysis.

## Conclusion

The judgment of the Juvenile Court terminating Father's parental rights to the Child is affirmed. This cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Ronald S., and his surety, if any.

s/ D. Michael Swiney
D. MICHAEL SWINEY, CHIEF JUDGE

- 19 -